[Civ. No. 4759. First Appellate District, Division One.—August 14, 1924.]

ERNST KALLENBERG et al., Respondents, v. EMERY LONG et al., Appellants.

[1] WATERS AND WATERCOURSES — WRONGFUL DAMMING OF WATERCOURSE — MEASURE OF DAMAGES — EVIDENCE.—In this action to recover damages for wrongfully damming back the waters of a certain watercourse extending across plaintiffs' lands and those of defendants, and to enjoin further interference with the flow of said waters, the amount of actual damages awarded by the jury was amply sustained by the evidence showing the reduction in the quantity and the inferior quality of fruit produced by plaintiffs' orchard for the three years immediately succeeding the inundation of their lands as compared with the fruit grown previously, as well as the actual destruction of many trees, the serious impairment of the bearing powers of others, and the direct injury to the productivity of the soil.

[2] ID.—MALICIOUS MOTIVE — EVIDENCE — EXEMPLARY DAMAGES—VERDICT—APPEAL.—In such action, notwithstanding the assertion of

---

1. See 27 R. C. L. 1166.
2. See 8 Cal. Jur. 865, 866; 8 R. C. L. 562, 585, 590.

defendants that the watercourse in question was not obstructed by them from malicious motives but as a result of legal advice, and under the *bona fide* belief that they had a right to do so in the protection of their own property rights, plaintiffs having introduced evidence to the effect that for some time preceding the obstruction of said watercourse there had been and at that time there was much hostility between plaintiffs and defendants, it was for the jury to say which of the motives prompted defendants to commit the wrongful acts; and there having been ample evidence to support the jury's conclusion that defendants' acts were prompted by malicious motives, its determination on the question of exemplary damages was conclusive on appeal.

[3] ID.—WRONGS OF SON—CONSENT OF FATHER—LIABILITY.—In such action, notwithstanding the father seemed disposed to avoid unpleasant personal altercations with the plaintiffs, the son having dammed up the watercourse only after he had consulted with and obtained the express consent of the father, this fact of itself was sufficient to fasten upon the father an equal responsibility for the wrong committed.

[4] ID.—LOCATION OF WATERCOURSE—EVIDENCE—JUDGMENT.—In such action, the easement in question having been in existence a number of years prior to and at the time defendants acquired their property, and the enjoyment thereof in its original location having continued without interruption until the time of the controversy giving rise to such action, the trial court correctly decreed that said watercourse should remain in that location.

---

(1) 40 **Cyc.**, p. 690.  (2) 4 **C. J.**, p. 873, sec. 2847; 40 **Cyc.**, p. 691. (3) 40 **Cyc.**, p. 690.  (4) 40 **Cyc.**, p. 663.

APPEAL from a judgment of the Superior Court of Napa County. Henry C. Gesford, Judge. Affirmed.

The facts are stated in the opinion of the court.

E. S. Bell for Appellants.

Clarence N. Riggins for Respondents.

KNIGHT, J.—This is an action to recover damages for wrongfully damming back the waters of a certain watercourse extending across plaintiffs' lands and those of the

---

3.  See 20 Cal. Jur. 450; 20 R. C. L. 627.
4.  See 9 Cal. Jur. 951; 9 R. C. L. 796.

defendants, and to enjoin further interference with the flow of said waters.

The question of damages was submitted to a jury and a verdict was rendered in favor of plaintiffs for $1,800 actual and $200 exemplary damages. The equitable issues were passed upon by the court and the injunctive relief prayed for was granted. Judgment was entered accordingly and the defendants appealed.

The original complaint, filed here on March 3, 1917, contained two counts based upon different theories of plaintiffs' right to maintain the action. A general demurrer was interposed and was by the trial court sustained. Plaintiffs declined to amend and a judgment of dismissal followed. Plaintiffs appealed and the judgment was reversed, with directions to the trial court to overrule said demurrer and take further proceedings proper to determine the rights of the parties. (*Kallenberg* v. *Long,* 39 Cal. App. 731 [179 Pac. 730].) Plaintiffs afterward filed an amended complaint in which they abandoned the first count and restated the second cause of action in substantially the same form as it was set forth in the original complaint, the sufficiency of which had already been approved on appeal. The theory of said cause of action was that the former owner of the entire tract of land of which the two parcels here involved were a part had constructed a system of drainage for the entire tract whereby the surface and drainage waters from the upper parcel were discharged upon and carried over and across the lower one by means of the watercourse in question, and had subsequently divided and sold said tract; that the defendants as the purchasers of the lower tenement took the same with all the burdens that appeared to belong to it at the time of sale, as between it and the property retained by the grantor and that such sale to them carried with it the implication of said servitude. The origin of said watercourse, its original and present location, the necessity therefor and the right of plaintiffs to have the same maintained in its original location, as alleged in said complaint, are fully set forth and explained in the opinion rendered upon the former appeal, and, in view of the fact that upon this appeal respondents raise no question of the existence of said easement and do

not deny that they obstructed the same, it becomes unnecessary to again relate those matters of pleading here.

The present appeal is taken upon two principal grounds, namely, insufficiency of the evidence to justify a verdict against appellants for the amount of damages, actual and exemplary, awarded by the jury, and that the trial court extended too far the terms of the injunctive relief granted when it directed appellants to maintain said watercourse in its original location and in the manner described in the judgment.

The evidence relating to those two questions may be stated as follows: The appellants Long and the respondents Kallenberg, are, respectively, the owners of adjoining properties situate in the Napa Valley between the towns of St. Helena and Calistoga. For approximately forty years prior to 1906 these properties were held under one ownership. During that year, 1906, the Longs purchased the lower or northerly portion thereof. At that time there existed on the land so purchased by them the watercourse in question, which extends from a point on the lands now owned by the Kallenbergs northerly across the boundary line running easterly and westerly between the two properties and running thence, in a direct line, over and across the Long property to the northerly boundary thereof, where it opened into another waterway running at right angles thereto along the right of way of the Southern Pacific Company. The surface and drainage waters from the Kallenberg property accumulated in said waterway on the latter's property and flowed thence down said waterway across the Long property then, increased in volume by the surface and drainage waters from the Long place, emptied into said ditch running along the railroad right of way. The easterly end of the Kallenbergs' land, adjoining the Long property on the southerly side thereof, was planted to orchard, mostly to prunes and pears, and part of it was adapted to the growing of berries. In January, 1917, which was during the rainy season, appellants dammed up said watercourse at a point immediately inside their property line. The flow of water was thereby obstructed and turned back on to respondents' land. Kallenberg testified that he thereupon opened the dam so as to release part of the impounded water into a shallow "dead

furrow'' on appellants' property running at right angles
with said watercourse, and located on the Longs' property,
close to and along the boundary line dividing the two prop-
erties; that defendant Stanley Long immediately closed said
opening with rocks and sand-bags, after which he, Kallen-
berg, again opened the dam and Long again closed it; that
after these operations had been repeated several times Stan-
ley Long ran to his house and returned to the scene with a
revolver, with which he shot at Kallenberg; that the defénd-
ant, Mrs. Ada Long, the mother of Stanley and the wife of
the defendant Emery Long, was present at the time and
told Stanley to ''shoot him.'' Stanley Long does not deny
firing a shot, but claims he shot ''in the air'' to frighten
Kallenberg, who had been using vile language toward his
mother. Kallenberg made no further attempt to open said
dam. About that time the Longs attempted to improve said
''dead furrow'' so as to allow some of the released water to
flow therein. The evidence shows, however, that said ''dead
furrow,'' after the improvement had been made, was eighteen
inches or two feet less in depth than the watercourse on the
Kallenberg side of the line with which it connected and that
consequently there was always an accumulation of water of
more than eighteen inches in depth in said watercourse on
the Kallenberg property before any water therefrom was
allowed to pass down said furrow. The result of damming
up said watercourse and the diversion of said water down
said furrow was seriously injurious to plaintiffs' property.
The orchard and berry land was more or less flooded and
after the floods receded the water stood thereon in pools.
The ground was saturated on account of lack of drainage,
the percolating water standing at a level of within six or
eight inches of the surface of the soil. Aside from the oral
proof offered on this point, the photographs offered in evi-
dence clearly prove that these conditions existed. The excess
water killed five prune trees one year old, seven prune trees
six years old, twenty-two prune trees two years old and
seven young pear trees, and seriously, if not fatally, dam-
aged two other rows of prune trees. Besides, two or three
of the pear trees have commenced to rot in the ground.
Owing to the wet and soggy condition of the land respond-
ents were unable to go upon the same to cultivate the

orchard or berry land or to properly spray or care for the fruit trees. The fruit crops produced during the three succeeding years were very light as a consequence and the quality of the fruit was inferior, being small, imperfect, and diseased. One witness, who had been a fruit buyer in that locality for seventeen years, testified that prior to the damage to said orchard by water, said orchard produced pears "as nice" as any he had ever seen in Napa County, but that in 1917, after said damage by water, the fruit produced "wouldn't make good pie fruit. They were scabby, full of worms, small and out of shape. The lowest grade of fruit, even below bakers' pie fruit."

[1] Respondents' demand for damages covered four separate elements, namely, destruction of trees, injury to the health and bearing powers of the trees not destroyed, injury to the quality of fruit produced and loss of use of remaining lands. Appellants assert that none of these elements was proved, for the reason, as they contend, that there was no evidence to prove the value of the trees destroyed "as they stood growing upon the land before said injuries"; or "the value or quantity of crops which would have grown upon the trees if they had not been killed"; or the amount of loss suffered "by reason of the alleged injuries to the health and bearing powers of said orchard and trees"; or "the value of said orchard and trees before said alleged injuries and the value thereafter; or the quantity of inferior fruit produced because of inability to work or cultivate said orchard, as compared with fruit of the same variety grown in the same vicinity unaffected with similar conditions; and that no evidence was offered of the rental value of said lands respondent claims he was unable to work or cultivate."

After a review of the entire record we are of the opinion that ample evidence was offered upon which the amount of damages awarded by the jury is supported. Without attempting to set forth such evidence in detail, it may be stated that respondents showed the reduction in the quantity and inferior quality of the fruit produced by said orchard for the three years succeeding the inundation of the lands as compared with the fruit grown previously. They also proved the actual destruction of many trees, the serious impairment to the bearing powers of others and the direct injury to the productivity of the soil. Such proof

was available to rspondents owing to the fact that the action was not tried until June, 1920, nearly three and a half years after the wrongful act was committed. For instance, respondent offered proof to the effect that during the two years immediately preceding the damage by water the pear orchard produced crops of fifty or sixty per cent number one pears, that is, pears measuring a minimum of two and a half inches in diameter, which admittedly brought a much higher price than the number two pears or the still lower grade called "cutting stock"; that during the succeeding three years, 1917, 1918, and 1919, the same orchard, besides producing greatly reduced crops, grew only two and one-half per cent of the number one variety. The others were either number two or "cutting stock," largely the latter, and of the twenty tons produced during those three years four and one-half tons were entirely unsalable. Using these figures as a basis of calculation, in connection with the market price of number one pears during the years 1917, 1918, and 1919, it proves that for those three years, from the pear crop alone, respondents suffered a gross loss of over $500. This evidence was of value, not only for the purpose of showing an actual money loss from crops that, with reasonable certainty, would otherwise have been produced, but it also served as proof of the serious and permanent impairment to the bearing qualities of the trees. The members of the jury were thereby enabled, we think, in connection with matters which were known to them as a result of experience, to fix a fair value of the trees injured and destroyed. Additional evidence was offered of the rental value of the land of which the Kallenbergs were deprived for three years for the culture of berries, showing that a fair rental value was $250 per year. While appellant assails the accuracy of these figures, the jury doubtless accepted them as true and the weight of the same was a matter entirely within their power to determine. It must be remembered that respondents were not suing for the destruction of any particular growing crops but for the permanent injury to their orchard and the loss of the use of the land, and we are not prepared to say as a matter of law that the amount of actual damages awarded is not sustained by the evidence.

[2] The next contention made by appellants is that the verdict for exemplary damages was not justified. In this

respect appellants assert that said watercourse was not obstructed by them from malicious motives but as a result of legal advice, and under the *bona fide* belief that they had a right to do so in the protection of their own property rights. The respondents offered evidence to the effect, however, that for some time preceding the obstruction of the watercourse there had been and at that time there was much feeling of hostility between the two families. It was therefore a matter for the jury to say which of the motives prompted the appellants to commit the acts which resulted in the partial destruction of respondents' orchard. The jury, by awarding exemplary damages, concluded that the appellants were actuated by malicious motives and we think there is evidence in the record sufficient to support that conclusion. It appears that owing to existing bitterness the families had not been on speaking terms for some time. A previous dispute arose over the location of the boundary line between the two properties and after several quarrels the Longs built a board fence seven feet high for a distance of about four hundred feet along the boundary line and changed the roadway leading to their dwelling from one street to another so that they would not be compelled to see or meet the Kallenbergs. Members of the Long family, including the appellants Mrs. Ada Long and Stanley Long, but not Emery Long, in the presence and hearing of the Kallenbergs, made remarks about the latter which were annoying and offending. [3] True, Emery Long seemed disposed to avoid unpleasant personal altercations with the Kallenbergs. Nevertheless, it is admitted that Stanley Long dammed up the watercourse which resulted in the injury to said orchard only after he had consulted with and obtained the express consent of his father, which fact of itself was sufficent evidence to fasten upon the latter an equal responsibility for the wrong committed. In view of the feeling of *animus* between the parties, as shown by the evidence, we are not allowed to set aside the determination of the jury on the question of exemplary damages.

[4] The last point made by appellants is that as owners of the servient tenement no legal obligation rests upon them to maintain said ditch in any given location on the property as required by said judgment. They contend that conceding the right of respondents to have the waters from

their property discharged upon appellants' land, appellants may take care of said water in any manner best suited to their convenience so long as their method of doing so causes no injury to respondents. We think that under the circumstances shown by the evidence the terms of the judgment are proper and do not violate any of appellants' property rights. The easement in question was in existence a number of years prior to and at the time appellants acquired their property, and the enjoyment thereof in its original location continued without interruption until the time of this controversy. We therefore believe that the court correctly decreed that said watercourse should remain in that location. (*Gregory* v. *Nelson*, 41 Cal. 278.) Assuming, however, that appellants did have the right to divert the waters to another course, it is admitted by them that such right depended upon the question of the injury that would thereby result to respondents. The evidence shows that the change made by appellants did cause respondents serious damage. It was the very thing that has given rise to this lawsuit. The trial court had before it during the trial only the two methods of relieving respondents' land of the said water—the original watercourse and the improvised one contended for by appellants. After hearing the evidence it found, in effect, by the judgment, that the latter one was not feasible and that the water should follow its original course. That its conclusion was manifestly correct is shown by the admitted fact that the attempted diversion resulted in the inundation complained of, which would doubtless have been repeated by the continued diversion. There is nothing in the judgment, as we read it, that denies to appellants as they contend ''the legal right to use the water coming through said ditch upon their own premises for any purpose whatever so long as they did not use it in a manner or in a way which would inflict upon said plaintiffs any damages.'' The use of said water by appellants was not an issue in the case. In fact, if they had used all of it, there would have been no complaint. It was the obstruction of the watercourse and the turning back of the water that gave to respondents their right of action.

Judgment affirmed.

Tyler, P. J., and St. Sure, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 9, 1924.

All the Justices concurred.